## UNITED STATES of America

v.

Frank Joseph ROSA a/k/a "Joe" Joseph Sica, Vincent Mannella.

### Appeal of Joseph SICA.

No. 75–2411.

United States Court of Appeals, Third Circuit.

Argued April 6, 1977.

Reargued May 12, 1977.

Decided July 6, 1977.

Certiorari Denied Oct. 3, 1977.
See 98 S.Ct. 191.

Thomas A. Livingston, Dennis J. Clark, Pittsburgh, Pa., for appellant.

Blair A. Griffith, U. S. Atty., Pittsburgh, Pa., John W. Murtagh, Jr., Special Atty., U. S. Dept. of Justice, Washington, D. C., James E. Roark, Asst. U. S. Atty., Pittsburgh, Pa., for appellee.

Argued April 6, 1976

Before BIGGS, GIBBONS and HUNTER, Circuit Judges.

Reargued May 12, 1977

Before SEITZ, Chief Judge, and BIGGS, VAN DUSEN, ALDISERT, ADAMS, GIBBONS, ROSENN, HUNTER, WEIS and GARTH, Circuit Judges.

JAMES HUNTER, III, Circuit Judge:

Joseph Sica appeals from his conviction on a charge of attempted extortion in viola-

tion of the Hobbs Act, 18 U.S.C. § 1951.[1] He argues that (1) the Hobbs Act cannot be interpreted to reach the activity—attempted extortion—in which he allegedly engaged; (2) there was not substantial evidence to support the conviction; (3) the trial court's refusal to grant him a severance from his co-defendants prejudiced his right to a fair trial; and (4) the court's charge to the jury was fatally defective, because it did not contain the "accomplice charge" sought by Sica. Finding no merit in any of these claims, we affirm.

## I.

Joseph Sica, Frank Joseph Rosa, and Vincent Mannella were indicted on February 26, 1975, in the District Court for the Western District of Pennsylvania. Count I of the indictment alleged a conspiracy to violate 18 U.S.C. § 1951; it was dismissed during trial and is of no further relevance. Count II charged that from July 23, 1974, to August 15, 1974, Sica, Rosa, and Mannella unlawfully and wilfully attempted to obstruct, delay, and affect interstate commerce and the movement of articles and commodities in commerce by extortion, in violation of 18 U.S.C. § 1951.

Trial began on August 5, 1975. The first of two Government witnesses was Katherine Vlack Kendall. She testified that during the summer of 1974, she had been employed as a secretary by Mannella Engineers. At some point during the summer, Rosa and Sica both arrived to see Vincent Mannella. Kendall could not recall the date of this meeting, but she testified that Rosa and Sica were together at the office on only one occasion.

While Rosa and Sica were with him, Mannella had Kendall call Joseph Vacarello and ask Vacarello to come to the office. Vacarello arrived shortly thereafter. Kendall testified that she did not know what took place among the four men.

The Government's chief witness was Joseph Vacarello, part-owner of a landscaping and contracting business. He testified that on July 23, 1974, he received a telephone call from Mannella, requesting that he come to Mannella's office. He complied, and Mannella introduced him to Sica and Rosa upon his arrival. Vacarello testified that Mannella began to talk about the Overlook Park project, a job on which Vacarello's company had a few weeks earlier submitted the lowest bid to the Borough of Monroeville, Pennsylvania. Sica then identified himself and Rosa as representatives of several unnamed members of the Borough Council. Sica said that there was some problem with the project, that they would like to see Vacarello get the job, but that they would like a "donation." Sica told Vacarello that Mannella would call Vacarel-

[1]. 18 U.S.C. § 1951 provides as follows:

§ 1951. Interference with commerce by threats or violence

(a) Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined not more than $10,000 or imprisoned not more than twenty years, or both.

(b) As used in this section—

(1) The term "robbery" means the unlawful taking or obtaining of personal property from the person or in the presence of another, against his will, by means of actual or threatened force, or violence, or fear of injury, immediate or future, to his person or property, or property in his custody or possession, or the person or property of a rela-

tive or member of his family or of anyone in his company at the time of the taking or obtaining.

(2) The term "extortion" means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right.

(3) The term "commerce" means commerce within the District of Columbia, or any Territory or Possession of the United States; all commerce between any point in a State, Territory, Possession, or the District of Columbia and any point outside thereof; all commerce between points within the same State through any place outside such State; and all other commerce over which the United States has jurisdiction.

(c) This section shall not be construed to repeal, modify or affect section 17 of Title 15, sections 52, 101–115, 151–166 of Title 29 or sections 151–188 of Title 45.

lo later about the donation, and Mannella agreed.

That afternoon, according to Vacarello, Mannella called and asked Vacarello to come to his office again. Upon his arrival, he found Mannella alone. Mannella immediately told him that the donation was to be $10,000. Vacarello refused to pay. Mannella then clarified the "problem" to which Sica had alluded earlier in the day. He showed Vacarello a copy of the minutes of a recent Monroeville Recreation Committee meeting, which disclosed that the Committee had recommended that Vacarello not be awarded the Overlook Park project.

Vacarello still refused to pay, telling Mannella that he would simply bid on other Monroeville projects. Mannella warned him to save his time and money. There was also according to Vacarello, some discussion of how Rosa, Sica, and Mannella would split the donation.

Vacarello left without agreeing to pay. Nevertheless, he did receive the Overlook Park contract. As far as the record shows, he was not subsequently denied other Monroeville contracts.

Mannella was the only witness for the defense. He testified that there was only one meeting, the one on the morning of July 23, 1974. He claimed that at the time of the alleged afternoon meeting, he had been out of his office. He denied any intention to extort money from Vacarello.

The jury evidently believed Vacarello. It convicted all three defendants. All post-trial motions were denied in a thorough and thoughtful opinion by the district judge, *United States v. Rosa*, 404 F.Supp. 602 (W.D.Pa.1975). This Court affirmed the convictions of Rosa and Mannella without opinion. *United States v. Rosa*, 535 F.2d 1248 (3d Cir. 1976), *cert. denied*, 429 U.S. 822, 97 S.Ct. 71, 50 L.Ed.2d 83 (1976). A panel of this Court reversed Sica's conviction, *United States v. Sica*, No. 75–2411 (3d Cir. 1976), but the court in banc vacated the panel judgment and granted the Govern-

ment's petition for rehearing on December 16, 1976.

## II.

Sica argues that a judgment of acquittal should have been entered, because the statute under which he was indicted, 18 U.S.C. § 1951, does not proscribe the activity in which he was proven[2] to have engaged, i. e., attempted extortion in an attempt to obstruct commerce. His argument turns largely on his reading of section 1951(a):

> (a) Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined not more than $10,000 or imprisoned not more than twenty years, or both.

Sica insists that the phrase "attempts or conspires so to do" refers to obstruction of commerce, not to extortion. Three expert grammarians submitted a letter in support of this position. Thus, says Sica, the Act prohibits an attempt to obstruct commerce by completing the act of extortion, but it does not by its terms reach merely an attempted extortion. And because an attempt to commit a federal offense is itself an offense only when statutorily proscribed, Sica concludes that proof of his attempt to extort money from Vacarello does not establish any violation of section 1951.

This Court has already indicated, in dictum, that the Hobbs Act does prohibit attempted extortion in an attempt to obstruct commerce. *United States v. Starks*, 515 F.2d 112, 116 (3d Cir. 1975). As far as our research discloses, every court of appeals that has ruled on the question has reached a similar conclusion. *United States v. Iozzi*, 420 F.2d 512 (4th Cir. 1970), *cert. denied*, 402 U.S. 943, 91 S.Ct. 1607, 29 L.Ed.2d 111

---

**2.** Because this is an appeal from a judgment upon a verdict of guilty, we must adopt the view of the evidence most favorable to the

Government. *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942).

(1971); *United States v. Tropiano*, 418 F.2d 1069, 1082–83 (2d Cir. 1969), *cert. denied*, 397 U.S. 1021, 90 S.Ct. 1262, 25 L.Ed.2d 530 (1970); *United States v. Green*, 246 F.2d 155, 157 (7th Cir.), *cert. denied*, 355 U.S. 871, 78 S.Ct. 122, 2 L.Ed.2d 76 (1957); *Hulahan v. United States*, 214 F.2d 441, 445 (8th Cir.), *cert. denied*, 348 U.S. 856, 75 S.Ct. 81, 99 L.Ed. 675 (1954); *see United States v. Shackleford*, 494 F.2d 67 (9th Cir.), *cert. denied*, 417 U.S. 934, 94 S.Ct. 2647, 41 L.Ed.2d 237 (1974); *United States v. Jacobs*, 451 F.2d 530, 534 (5th Cir. 1971), *cert. denied*, 405 U.S. 955, 92 S.Ct. 1170, 31 L.Ed.2d 231 (1972).

This conclusion squares with the legislative history of the Hobbs Act. Section 1951 derives from the Anti-Racketeering Act of 1934, 48 Stat. 979. Section 2 of the 1934 Act described persons who would be guilty of felony for doing certain things; among them was the following:

Any person who, in connection with or in relation to any act in any way or in any degree affecting trade or commerce or any article or commodity moving or about to move in trade or commerce—

(a) Obtains *or attempts to obtain, by the use of or attempt to use* or threat to use force, violence, or coercion, the payment of money or other valuable considerations . . .

(Emphasis added.) Congress amended the Act in 1946, in response to a restrictive reading by the Supreme Court.[3] The amended Act, 60 Stat. 420, read in part as follows:

Sec. 2. Whoever in any way or degree obstructs, delays, or affects commerce, or the movement of any article or commodity in commerce, by robbery or extortion, shall be guilty of a felony.

Sec. 3. Whoever conspires with another or with others, or acts in concert with another or with others to do anything in violation of section 2 shall be guilty of a felony.

Sec. 4. Whoever *attempts or participates in an attempt to do anything in violation of section 2* shall be guilty of a felony.

(Emphasis added.) Thus, an attempt to commit extortion in order to obstruct commerce seems to have been within the purview of the 1946 Act.

The Act was codified in 1948, and the separate sections dealing with conspiracies and attempts were consolidated with section 2. 62 Stat. 793 c. 645. This gave section 1951 its present form. Nothing in the legislative history of the codification, however, suggests any intention to change the Act's ban on attempts to rob or extort. Indeed, the evidence suggests the contrary. The reviser's notes to Title 18, § 1951 state that changes in phraseology and arrangement were designed solely to effect consolidation. *United States v. Varlack*, 225 F.2d 665, 672 (2d Cir. 1955).[4]

We hold, therefore, that section 1951 forbids attempted extortion which would, if the act were completed, have the effect of obstructing commerce. This holding gives effect to the apparent intent of

**3.** In *United States v. Teamsters Local 807*, 315 U.S. 521, 62 S.Ct. 642, 86 L.Ed. 1004 (1942), the Court declared that certain terrorist activities carried out by labor organizations fell outside the scope of the Anti-Racketeering Act. In response, Congress passed amendments in 1946, 60 Stat. 420, which were designed to bring labor terrorism within the Act's ban. *See United States v. Callanan*, 364 U.S. 587, 590–91, 81 S.Ct. 321, 5 L.Ed.2d 312 (1961); *United States v. Yokley*, 542 F.2d 300, 302–03 (6th Cir. 1976); *United States v. Varlack*, 225 F.2d 665, 669 (2d Cir. 1955).

**4.** The House Report dealing with the 1948 codification explained the change:

The words "attempts or conspired so to do" were substituted for sections 3 and 4 of the 1946 act, omitting as unnecessary the words "participates in an attempt" and the words "or acts in concert with another or with others", in view of section 2 of this title [Title 18] which makes any person who participates in an unlawful enterprise or aids or assists the principal offender, or does anything towards the accomplishment of the crime, a principal himself.
H.R.Rep.No.304, 80th Cong., 2d Sess. A. 131 (1947).

Congress and the obvious purpose of the statute.[5]

### III.

█ Sica's next contention is that there was insufficient evidence to support his conviction. Specifically, he points out that he was not present at the afternoon meeting, during which the attempt to extort was actually made. He adds that there is no evidence to justify imputing to him the words and actions of Mannella at the afternoon meeting.

While it is true that Sica was not present during the actual attempt, there was sufficient evidence [6] to justify the jury's apparent belief that Mannella spoke for Sica. According to Vacarello, it was Sica who said that he and Rosa represented the Monroeville council members. It was Sica who declared: "[W]e would like to see you get the job but we would like a donation." Tr. at 65. And it was Sica who told Vacarello that Mannella would call later about the size of the donation.

If the jury believed Vacarello's story—and it obviously did—there was sufficient evidence as a matter of law to support an inference that Mannella spoke on behalf of Sica, that Sica had associated himself with the criminal enterprise. *United States v. Barber*, 429 F.2d 1394, 1397 (3d Cir. 1970).

### IV.

█ Sica claims that his right to a fair trial was prejudiced by the trial court's refusal to sever his trial from that of Rosa.[7] But to win reversal on this point, he must show that the refusal to sever amounted to an abuse of discretion, and the "burden of demonstrating such abuse is a heavy one." *United States v. Somers*, 496 F.2d 723, 730 (3d Cir.), *cert. denied*, 419 U.S. 832, 95 S.Ct. 56, 42 L.Ed.2d 58 (1974). *See also United States v. Armocida*, 515 F.2d 29, 46 (3d Cir.), *cert. denied*, 423 U.S. 858, 96 S.Ct. 111, 46 L.Ed.2d 84 (1975). Sica fails to carry that heavy burden.

Just before the Government rested its case, Sica's counsel moved for severance. He alleged that Rosa "has indicated a willingness to testify on behalf of Mr. Sica but that he will not give up his right to refuse to testify in his own trial." Tr. at 324. This motion was denied.

**5.** Sica also argues that even if section 1951 prohibits attempted extortion, no such attempt was proved as a matter of law. The crime of extortion involves an effort to arouse fear in the victim. Sica insists that neither he nor his cohorts aroused any fear in Vacarello; any fear of property loss—the Overlook Park contract—was induced instead by the actions of the Monroeville Recreation Committee. In light of the not very subtle hints that Sica and the others could influence the ultimate decision maker—the Borough Council—this argument evaporates. The threat to Vacarello's contractual interest was clear, and it emanated from Sica and his co-defendants; pay up and you will get the job; refuse and you will not be considered at all. In addition, Mannella implied that if the "donation" were not forthcoming, Vacarello would only be wasting his time by bidding on other Monroeville jobs.

Sica makes two other frivolous arguments relative to the question of attempted extortion. First, he argues that if we interpret § 1951 to forbid attempted extortion, then it is void for vagueness. In light of the rather clear legislative history and the substantial judicial gloss indicating that the Act does prohibit attempted extortion, we cannot agree.

Second, he insists that if the crime for which he was convicted was attempted extortion, then fatal variance occurred, for the indictment charged him with an "attempt to obstruct, delay and affect interstate commerce . . . by extortion." Since we have already held that the statutory language, tracked by the indictment, embraces attempted extortion, we cannot agree with this claim, either.

**6.** *See* note 2 *supra.*

**7.** Fed.R.Crim.P. 14 provides as follows:

*Relief from prejudicial joinder.* If it appears that a defendant or the government is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial together, the court may order an election or separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires. In ruling on a motion by a defendant for severance the court may order the attorney for the government to deliver to the court for inspection in camera any statements or confessions made by the defendants which the government intends to introduce at the trial.

After the Government rested, Sica's counsel made what must be considered a second request for severance, though the request was none too clear:

> Mr. Livingston: It having been represented to me by Mr. Rosa in the presence of his counsel that he could if called exculpate or provide testimony that would tend to exculpate Mr. Sica including but not limited to testimony that Mr. Sica is the father-in-law of Mr. Rosa and Mr. Rosa had a business relationship with Mr. Mannella and on the occasion of July 23 Mr. Sica went along with Mr. Rosa to Mr. Mannella's office and did not participate in any conversation with Mr. Vacarello [sic] or Mr. Mannella as has been testified to by Mr. Vacarello. It has been by inference suggested to me that there are other matters that Mr. Rosa would not discuss with me. It appear[s] that other matters may tend to incriminate him. He indicated a willingness to testify to these exculpatory matters, [if] not called in this particular trial . . . . .

Tr. 364. Rosa's counsel was present during this statement and remained silent throughout. Again, the trial court denied the motion to sever.

For purposes of discussion, we will assume that Sica did intend to have Rosa testify and that the testimony might have proved exculpatory. The crucial inquiry remains whether Sica has carried his heavy burden, *Somers, supra,* of demonstrating that the refusal to sever his trial was an abuse of discretion. *United States v. Finkelstein,* 526 F.2d 517, 523 (2d Cir. 1975), *cert. denied,* 425 U.S. 960, 96 S.Ct. 1742, 48 L.Ed.2d 205, *see United States v. Addonizio,* 451 F.2d 49, 62–63 (3d Cir.), *cert. denied,* 405 U.S. 936, 92 S.Ct. 949, 30 L.Ed.2d 812 (1972). We conclude that he has not. The district court properly determined that counsel's showing of possible prejudice to the defendant was insufficient.

The Fifth Circuit has listed several factors a trial court ought to consider in deciding whether to sever the trial of a particular defendant:

> (1) Does the movant intend or desire to have the codefendant testify? How must his intent be made known to the court, and to what extent must the court be satisfied that it is bona fide?

> (2) Will the projected testimony of the codefendant be exculpatory in nature, and how significant must the effect be? How does the defendant show the nature of the projected testimony and its significance? Must he in some way validate the proposed testimony so as to give it some stamp of verity[?].

> (3) To what extent, and in what manner, must it be shown that if severance is granted there is likelihood that the codefendant will testify?

> (4) What are the demands of effective judicial administration and economy of judicial effort? Related to this is the matter of timeliness in raising the question of severance.

> (5) If a joint trial is held, how great is the probability that a codefendant will plead guilty at or immediately before trial and thereby prejudice the defendant, either by cross-defendant prejudice or by surprise as it relates to trial preparation?

*Byrd v. Wainwright,* 428 F.2d 1017, 1019–20 (5th Cir. 1970).[8] Although this court has not had occasion to establish such a list, we find that of the Fifth Circuit illuminating. In light of those factors, we discern no abuse of discretion.

Factor number one was fulfilled. The defendant did express a desire to have co-

---

8. The Second Circuit established a different list:

> (1) the sufficiency of the showing that the co-defendant would testify at a severed trial and waive his Fifth Amendment privilege . . .; (2) the degree to which the exculpatory testimony would be cumulative . .; (3) the counter arguments of judicial economy . . .; and (4) the likelihood that the

testimony would be subject to substantial, damaging impeachment. . . .

*United States v. Finkelstein,* 526 F.2d 517, 523–24 (2d Cir. 1975), *cert. denied,* 425 U.S. 960, 96 S.Ct. 1742, 48 L.Ed.2d 205. Obviously, both the Second and Fifth Circuits are concerned with similar problems. Neither list purports to be exclusive.

defendant testify, and that desire was made known to the court.

Factor number two is more conjectural, since there was no separate voir dire requested concerning the projected nature of Rosa's testimony.[9] The significance of the exculpatory effect of Rosa's projected testimony is difficult to gauge in view of the vagueness of counsel's statement. Sica's family relationship to Rosa and Rosa's business relationship with Mannella had already been proved by other witnesses. The only other allegation was that Rosa would testify that Sica "did not participate in any conversation with Mr. Vaccarello [sic] or Mr. Mannella. . . ."

Factor number three is also questionable. While Rosa's attorney did not contradict the statement that Rosa was willing to testify at a separate trial, neither did he promise that Rosa would do so. Instead, he remained silent. We do not imply that Rosa's attorney acted in bad faith. We observe only that there was no commitment by Rosa to follow the course charted by Sica's counsel.

About factor number four there can be no doubt. Judicial economy militated strongly against severance. The proof offered at a separate trial would have been completely duplicative of the proof in the case *sub judice*. Furthermore, the fact that the motion came so late in the course of the trial entitled the court to view it with some skepticism; if Rosa could genuinely exculpate his father-in-law completely at the close of the Government's case, he ought to have been willing to do so at the outset.

The timing of the motion simply reinforces the inference that Rosa at that point had little to lose by trying to help Sica get clear of the case.

Factor number five—a guilty plea—is not and cannot be urged.

The balance among these four factors is not an easy one to strike. It is true that Sica was unable to call a witness who might have contradicted the only inculpatory testimony—Vacarello's. But it is also true that Rosa was in a position to do so at absolutely no risk to himself; that he had a family incentive for doing so; that he never promised he actually would testify; that the lateness of the offer casts some doubt on the authenticity of the projected testimony; that the severed trial would be completely duplicative. In view of the standard of review—abuse of discretion—we are in no position to substitute our judgment for that of the district court. We must allow that court's decision to stand unless we are convinced that Sica was deprived of his right to a fair trial. *Somers, supra,* 496 F.2d at 730. Sica simply has not carried his heavy burden on that score.

## V.

Finally, Sica argues that the court erred in refusing to give the jury a standard accomplice charge, and its "corollary" under *Cool v. United States,* 409 U.S. 100, 93 S.Ct. 354, 34 L.Ed.2d 335 (1972), with respect to the testimony of Mannella. In general, an accomplice charge[10] need be given only when the alleged accomplice incriminates the defendant. *See, e. g., Craw-*

9. The holding of such a voir dire would be a proper vehicle for the resolution of the severance motion. It would permit the parties and the court to explore, under oath, the likelihood that the co-defendant would, indeed, testify at any severed trial. It might also allow some consideration of the projected testimony's content.

10. A standard accomplice charge would instruct the jury as follows:

An accomplice is one who unites with another person in the commission of a crime, voluntarily and with common intent. An accomplice does not become incompetent as a witness because of participation in the crime charged. On the contrary, the testimony of one who asserts by his testimony that he is an accomplice, may be received in evidence and considered by the jury even though not corroborated by other evidence, and given such weight as the jury feels it should have. The jury, however, should keep in mind that such testimony is always to be received with caution and considered with great care.

(You should never convict a defendant upon the unsupported testimony of an alleged accomplice, unless you believe that unsupported testimony beyond a reasonable doubt.)

E. Devitt & C. Blackmar, Federal Jury Practice & Instructions § 17.06 (3d ed. 1977); *see United States v. Armocida,* 515 F.2d 29, 47 (3d Cir. 1975).

ford v. United States, 212 U.S. 183, 204, 29 S.Ct. 260, 53 L.Ed. 465 (1909); *Cool, supra,* 409 U.S. at 103, 93 S.Ct. 354. In this case, Mannella did not give any testimony inculpating Sica. Indeed, Mannella spent his entire time on the stand denying that any crime had taken place. He did place Sica at the morning meeting, but no crime was committed then; moreover, the testimony of Vlack placed Sica there, too.

*Cool* is totally inapposite. In *Cool,* the trial court impermissibly diminished the Government's burden of proof by instructing the jury that it could consider a defense witness's exculpatory testimony only if it found that testimony true beyond a reasonable doubt. Thus, the trial court erred by giving an accomplice charge when the accomplice testified for the defense. Here, the trial judge committed no such error. Indeed he took care to highlight for the jury the exculpatory portions of Mannella's testimony. App. at 630a–32a. *Cool* contains no affirmative requirement that some sort of reverse accomplice charge be given whenever an alleged accomplice testifies for the defense.

### VI.

For the foregoing reasons, the judgment of conviction will be affirmed.

BIGGS, Circuit Judge, dissenting.

I confess to an abiding disquietude as to the result reached by the majority in this case.

### I.

### MISTAKEN INTERPRETATION OF THE RECORD BY THE MAJORITY

I am in full agreement with the majority's position that severance is within the sound discretion of the trial court. However, the question remains whether the learned District Judge actually exercised his discretion to deny severance until he filed his opinion on October 29, 1975, some 53 days after the last motion for severance set out in Sica's "Motion for Judgment of Acquittal, for a New Trial, and for Arrest of Judgment,"[1] *viz.,* paragraphs "2" and "7", filed August 18, 1975. See *United States v. Rosa,* 404 F.Supp. 602, 610–611 (1975). Sica made two previous motions for severance, one on August 7, 1975 (Tr. 323; 370a), and another the following day, August 8, 1975 (Tr. 364; 411a). These motions were met with immediate and unexplained denials by the learned Trial Judge. See the transcript and appendix-page citations set out above.

The majority concludes that there was no abuse of discretion by the trial court in denying Sica's motion for severance and in its opinion finds that Sica's offers of proof were neither sufficiently clear nor corroborated. However, it is submitted that the record before us shows no indication the learned Trial Judge exercised his discretion until he rendered his opinion and that he waited until the very end of the trial, *i. e.,* ended by his judgment and opinion in *Rosa,* 404 F.Supp. 602. At that point, of course, no response could be made by Sica to his ruling on the motion or any evidence or corroboration of Sica's good faith could be offered. Had the trial court informed or indicated to Mr. Livingston, Sica's counsel, that he desired a corroborating statement from Rosa as to what he, Rosa, would say, or whether he intended to testify on Sica's behalf, with Rosa's counsel, Mr. Gondelman, standing at sidebar conference with Mr. Livingston, Sica's counsel, as was the case in *Byrd v. Wainwright,* 428 F.2d 1017 (5th Cir. 1970), one must assume that Mr. Gondelman would have informed the court then and there if Mr. Livingston, Sica's counsel, was misstating the facts. I cannot but believe that had the trial court made the suggestion of amplification of the record, that the suggestion would not have been

---

1. "Motion for Judgment of Acquittal, for a New Trial, and for Arrest of Judgment": "2. The Court erred in refusing to sever defendant Sica from defendant Rosa. . . . 7. Court erred in denying defendant Sica a severance so that he would be able to call in his defense.

Mr. Frank Joseph Rosa, who, in the presence of his counsel, indicated that he would in a separate trial testify to matters exculpatory in the nature set forth in the transcript and other matters not revealed because incriminatory in nature."

promptly complied with by counsel for Sica. The majority's emphasis upon *Byrd v. Wainwright, supra,* is not misplaced, but should be predicated upon an exercise of discretion by the district court.

The position taken by the Trial Judge seems similar to that of an old time English boxing referee, who merely "keeps the ring" and offers neither act nor word to facilitate the contest, yet Rule 2, Fed.R. Crim.Proc., 18 U.S.C., provides: *"Purpose and Construction.* These rules are intended to provide for the just determination of every criminal proceeding. They shall be construed to secure simplicity in procedure, fairness in administration and the elimination of unjustifiable expense and delay."

## II.

### ERRONEOUS INTERPRETATION BY THE MAJORITY OF BYRD V. WAINWRIGHT

The majority analyzes Sica's contention that the district court committed reversible error by refusing his motions for severance, relying on the Fifth Circuit's opinion in *Byrd v. Wainwright,* 428 F.2d 1017 (5th Cir. 1970). I have no quarrel with the majority's reliance on *Byrd* except for the fact that that reliance does not go far enough. *Byrd,* a state habeas corpus case, sets forth five factors which as a matter of a constitutional minimum ought to be considered when a court is faced with a motion to sever. They are:

"(1) Does the movant intend or desire to have the codefendant testify? How must his intent be made known to the court, and to what extent must the court be satisfied that it is bona fide?

"(2) Will the projected testimony of the codefendant be exculpatory in nature, and how significant must the effect be? How does the defendant show the nature of the projected testimony and its significance? Must he in some way validate the proposed testimony so as to give it some stamp of verity[?].

"(3) To what extent, and in what manner, must it be shown that if severance is granted there is likelihood that the codefendant will testify?

"(4) What are the demands of effective judicial administration and economy of judicial effort? Related to this is the matter of timeliness in raising the question of severance.

"(5) If a joint trial is held, how great is the probability that a codefendant will plead guilty at or immediately before trial and thereby prejudice the defendant, either by cross-defendant prejudice or by surprise as it relates to trial preparation?"

Id., 428 F.2d at 1019–1020 (notes omitted).

In the instant case the majority concludes that no abuse of discretion, amounting to a deprivation of a fair trial, occurred, using the *Byrd* analysis. I am compelled to a different result.

In respect to Factor "1" of *Byrd, supra,* relating to the desire of the movant to have his co-defendant Rosa testify, was, in my view and also according to the majority opinion, met by Sica.

The second factor set out in *Byrd,* the exculpatory nature of the testimony, the majority, quite remarkably, finds "conjectural." At Sica's second request his attorney, Mr. Livingston, said that Rosa would give exculpatory testimony on Sica's behalf if called in a separate trial. It is quoted in full in this opinion, *infra.* (Tr. 364; 411a). In judging that factor it must be kept in mind that Sica was kept in the case at the end of the Government's proofs solely on one theory: that he had silently acquiesced in conversations testified to by Vacarello which suggested that defendants Mannella and Rosa at later meetings would be acting on his behalf. The denial of the severance motion served to deprive Sica of the one witness who could have contradicted Vacarello on the contents of the conversation. The district court did not find that Rosa would not have testified in the manner claimed or that Sica's counsel made the motion in bad faith. The Government's case against Sica was thin, and the testimony of a witness who could impeach the one Government witness upon whom that case depended cannot be regarded as de minimis. There is no element of conjecture present as to exculpatory value.

The majority opinion also concludes in effect that the statement of the reason for severance was not clear, but on August 7, 1975, the following transpired (Tr. 324; 371a):

"Mr. Livingston [Sica's counsel]: *It has been represented to me that Mr. Rosa is prepared and has testimony that would tend to exculpate Mr. Sica. I cannot call Mr. Rosa in this trial in view of the fact that he is a defendant on trial. Out of the presence of the jury I am informing the Court that I propose to call him as a witness. He has indicated a willingness to testify on behalf of Mr. Sica but that he will not give up his right to refuse to testify in his own trial. I therefore, request that the Court sever either Mr. Rosa or Mr. Sica from this particular trial.*

"The Court: In other words, you want me to sever Rosa?

"Mr. Livingston: I care not, either one, your Honor.

"The Court: Either one?

"Mr. Livingston: Well, if Rosa is severed he cannot then refuse to testify in his own trial.

"The Court: I understand your motion to be sever Rosa, the same motion as Mr. Gondelman [2] made.

"Mr. Livingston: It is not the same, I want a trial where I can call Mr. Rosa as a witness and that can be accomplished by my request to sever Mr. Sica because if Mr. Sica is severed and later goes to trial he has no problem that he has now with calling Mr. Rosa as a witness because Mr. Rosa will go to conclusion here and he can be called as a witness at that time in a separate trial." (Emphasis added).

On August 8, 1975, the following transpired (Tr. 364; 411a):

"Mr. Livingston: *It having been represented to me by Mr. Rosa in the presence of his counsel that he could if called exculpate or provide testimony that would tend to exculpate Mr. Sica including but not limited to testimony that Mr. Sica is the father-in-law of Mr. Rosa and Mr. Rosa had a business relationship with Mr. Mannella and on the occasion of July 23 Mr. Sica went along with Mr. Rosa to Mr. Mannella's office and did not participate in any conversation with Mr. Vaccarello or Mr. Mannella as has been testified to by Mr. Vaccarello. It has been by inference suggested to me that there are other matters that Mr. Rosa would not discuss with me. It appearing that other matters may tend to incriminate him. He indicated a willingness to testify to these exculpatory matters, not called in this particular trial. In view of the Court's ruling that I cannot either get a severance for Mr. Sica or sever Mr. Rosa from this particular case with this matter now on record I will now before the jury rest as to the defendant Sica.*

"The Court: Well, these are the motions that were made yesterday and argued yesterday outside the hearing of the jury. The ruling remains the same." (Emphasis added).

The majority opinion states in respect to a motion for severance, "After the Government rested, Sica's counsel made what must be considered a second request for severance, though the request was none too clear.", *i. e.*, August 7, 1975. I cannot agree with this description of the clarity of the request for severance on either August 7th or 8th; both seem entirely clear to me. The language of the motions is neither subtle nor obscure, but states plainly and coherently the movant's basis for severance. Indeed, I would say the language was "crystal clear".

In respect to the third factor of *Byrd,* the willingness of Sica's codefendant, Rosa, to testify is difficult to assess in light of the learned Trial Judge's failure to exercise his discretion (discussed in section I of this opinion, *supra*) until the end of the trial and not when Sica's motions for severance were made on August 7 and 8.

The fourth *Byrd* factor, the timeliness of the tender in the light of judicial economy,

---

**2.** Mr. Gondelman, counsel for Rosa, made an earlier motion for severance of Rosa but on a different ground from that asserted by Sica.

is urged by the majority, although I am at a loss to understand its position.

Rule 14, Fed.R.Crim.Proc., 18 U.S.C., provides: "*Relief from Prejudicial Joinder. If it appears* that a defendant or the government is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial together, the court may order an election or separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires. In ruling on a motion by a defendant for severance the court may order the attorney for the government to deliver to the court for inspection *in camera* any statements or confessions made by the defendants which the government intends to introduce in evidence at the trial." (First emphasis added). The language of the rule suggests that an effective motion can be made at any time during the course of the trial. Indeed, in *Schaffer v. United States,* 362 U.S. 511, 516, 80 S.Ct. 945, 4 L.Ed.2d 921 (1960), Mr. Justice Clark stated: "We do emphasize, however, that in such a situation [request for severance] the trial court has a continuing duty *at all stages of the trial* to grant a severance if prejudice does appear." (Emphasis added).

Indeed, the position of the majority in respect to timely filing incorrectly differs from that of the district court, for it was stated by the District Judge in his opinion in this case, *Rosa, supra,* 404 F.Supp. at 614, as follows: "The United States submits that raising the issue [of severance], after the government had rested its case in chief was untimely in view of the fact that Rosa was Sica's son-in-law and the five month interval between indictment and trial. However, since there is no evidence that Rosa's willingness to testify at a separate trial became known to Sica prior to that time, we believe it would be improper to base our ruling on that ground since the court has a continuing duty at all stages of the trial to grant a severance if prejudice should appear.", citing *Schaffer v. United States, supra.*[3]

The attitude toward the motions for severance I think should have been treated with greater deference as was done in *Byrd.* In *United States v. Gleason,* 259 F.Supp. 282, 284 (S.D.N.Y.1966), the court stated: "It is enough to say that Karp [the movant] has shown persuasive ground for the claim that she needs Pitkin's [the co-defendant's] evidence; that the need must almost certainly go unsatisfied in a joint trial; and that there is substantially greater likelihood of her using him if they are tried separately."

What has been stated in *Gleason,* I deem to be truly applicable here.

It should be most particularly noted that in *Byrd* the opposite result from that favored by the majority in the case at bar was reached, and severance was granted, though the facts favoring severance in *Byrd* were not as strong as in the case at bar.

For the reasons stated, I must respectfully dissent.

I am authorized to state that Judge Aldisert and Judge Gibbons join in this dissent.

---

**3.** The fifth factor admittedly is not involved.