UNITED STATES of America, Appellee,

v.

William BOYD, James D'Metri, Michael J. Lipton, Stephen Powell, George Parr, Appellants.

Nos. 77–1622, 77–1623, 77–1624, 77–1625 and 77–1656.

United States Court of Appeals, Third Circuit.

Argued Feb. 13, 1978.

Resubmitted before the original panel Aug. 31, 1978.

Decided Oct. 3, 1978.

David W. Marston, U.S. Atty., Walter S. Batty, Jr., Thomas E. Mellon, Jr., Asst. U.S. Attys., Philadelphia, Pa., for appellee.

Alvin J. Bello, Philadelphia, Pa., for appellant, William Boyd.

Norman C. Henss, Philadelphia, Pa., for appellant, James D'Metri.

Douglas Riblet, Asst. Defender, Defender Ass'n of Philadelphia, Federal Courts Division, Philadelphia, Pa., for appellant, Stephen Powell.

Michael Kennedy, New York City, for appellant, George Parr.

Charles A. Glackin, Philadelphia, Pa., for appellant, Michael Lipton.

Before GIBBONS, HUNTER, Circuit Judges, and WEBER,* District Judge.

## OPINION OF THE COURT

GIBBONS, Circuit Judge.

In this case appellants raise several grounds for reversal of their convictions of conspiracy and substantive offenses relating to the manufacture and distribution of methamphetamine in the Philadelphia area during 1975. Although we have reviewed all of the contentions raised by appellants,[1] we shall discuss only two issues: 1) whether a prejudicial variance existed between the conspiracy count of the indictment and the proof adduced at trial; and 2) whether the trial judge erred in allowing the jury to consider evidence of illegal acts occurring after the conspiracy alleged in the indictment had terminated. Because we find that the admission of postconspiracy crimes was prejudicial error, we reverse.

## I.

This case arises from a sixteen-count indictment returned by a grand jury in the Eastern District of Pennsylvania naming sixteen individuals. Count one of the indictment alleged a conspiracy to manufacture and distribute methamphetamine, a Schedule II controlled substance; fourteen other counts related to methamphetamine distribution.[2] The government prosecuted the five appellants—William Boyd, James D'Metri, Michael Lipton, George Parr and Stephen Powell—together, along with Marthana Heyman, who has not appealed her conviction.

The government's case relied heavily on the testimony of Agent Laurence Kutney of the Pennsylvania Department of Justice, Bureau of Drug Control, and James Love, a government informant. Love introduced Kutney to appellant Boyd in July 1975 as a friend and narcotics dealer from Ohio. Through Boyd, Love and Kutney were introduced to the other appellants on the assumption that Kutney would serve as a source of supply for phenyl-2-propanone (P–2–P), a precursor involved in the manufacture of methamphetamine. Kutney first agreed to supply P–2–P in exchange for a share of the methamphetamine produced. At that time, the group included himself, Love, Boyd, D'Metri, and one other partner. Appellant D'Metri functioned as a chemist for the manufacturing process, and with the assistance of others, attempted to manufacture methamphetamine at a laboratory located on Ridge Avenue in Northeast Philadelphia. The attempt failed; Boyd himself indicated that the substance was not of good quality, and evidence at trial indicated that the substance produced was not methamphetamine. Nevertheless, at least part of the batch was sold, through Boyd and appellant George Parr.

---

* Honorable Gerald Joseph Weber, United States Chief Judge for the Western District of Pennsylvania, sitting by designation.

1. Defendants have raised the following additional contentions:

   1. "It was error for the government to introduce evidence of the criminal record of appellant Boyd at trial;"
   2. "The government's failure to honor its pre-trial discovery agreements and to abide by appellants' right to Jencks Act material was reversible error;"
   3. "The remarks made by the United States Attorney during trial violated the court's order and deprived appellants of a fair trial;"
   4. "The government's closing argument constituted prosecutorial misconduct and denied appellants a fair trial;" and
   5. "Agent Kutney's conduct in this case was an outrageous violation of the appellants' right to due process and appellants should have been afforded the opportunity pre-trial to prove the allegations of their motion to dismiss because of governmental misconduct."

   We have reviewed the record in this case and find these contentions to be without merit.

2. The remaining count did not relate to methamphetamine manufacture or distribution, and is not involved in this appeal.

After the failure of the Ridge Avenue attempt to manufacture the drug, Boyd brought Kutney into contact with Parr in August 1975. Through Parr, Kutney was introduced to appellants Lipton and Powell, who were to assist Parr in establishing a laboratory in Bucks County. Again, Kutney was to serve as the source of supply for P–2–P, in exchange for a share of the methamphetamine produced.

This arrangement proved to be more successful, and Kutney was provided with quantities of methamphetamine apparently manufactured at a laboratory in Bucks County. After the deliveries to Kutney, the defendants became suspicious of him, and his involvement with the group dropped off. The defendants were later arrested. The grand jury's indictment was returned in April 1976, and trial commenced on September 7, 1976.

### II.

Appellants raise the question of variance between the indictment and the government's proof at trial in two different ways. Parr, Lipton and Powell directly challenge the sufficiency of the evidence of the single conspiracy charged. D'Metri raises as error the trial judge's denial of his motion to sever his case from his co-defendants.

### A.

Appellants Parr, Lipton and Powell contend that their convictions should be reversed because the proof at trial indicated that the Ridge Avenue scheme and the Bucks County scheme were two separate conspiracies to manufacture and distribute methamphetamine rather than the single conspiracy charged in the indictment. They argue that under *Kotteakos v. United States*, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946), the prejudice inherent in eliciting before the jury the events surrounding the plans and actions of the earlier Ridge Avenue conspiracy affected their substantial rights.

Under *Kotteakos, supra,* proof at trial which establishes the existence only of multiple conspiracies when a single conspiracy is charged in the indictment constitutes a variance. If substantial rights of the defendants might have been affected by a variance, their convictions on the conspiracy count must be reversed. In determining whether a variance has occurred, we must first ascertain if, viewing the evidence in light most favorable to the government, substantial evidence supports the jury's determination of guilt on the single conspiracy charged in the indictment. *Glasser v. United States*, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942).

The gist of a criminal conspiracy, the agreement between co-conspirators, may continue over an extended period of time and involve numerous transactions. Parties may join the conspiracy after its inception, and may withdraw and terminate their relationship with the conspiracy prior to its completion. *See United States v. Klein*, 515 F.2d 751 (3d Cir. 1975); *United States v. Lester*, 282 F.2d 750 (3d Cir. 1960), *cert. denied*, 364 U.S. 937, 81 S.Ct. 385, 5 L.Ed.2d 368 (1961). The fact that conspirators individually or in groups perform different tasks in pursuing the common goal does not, by itself, necessitate a finding of several distinct conspiracies. *United States v. Lester, supra.* And even if a small group of co-conspirators are at the heart of an unlawful agreement, others who knowingly participate with the core members and others to achieve a common goal may be members of a single conspiracy. *United States v. Varelli*, 407 F.2d 735 (7th Cir. 1969).

It follows from these basic principles that the government, without committing a variance between a single conspiracy charged in an indictment and its proof at trial, may establish the existence of a continuing core conspiracy which attracts different members at different times and which involves different sub-groups committing acts in furtherance of the overall plan. As this Court stated in *United States v. Kenny*, 462 F.2d 1205 (3d Cir.), *cert. denied*, 409 U.S. 914, 93 S.Ct. 233, 34 L.Ed.2d 176 (1972):

*Kotteakos* prohibits charging multiple unrelated conspiracies, but it does not prohibit charging one master conspiracy and establishing at trial that under the master conspiracy more than one subsidiary scheme was involved.

462 F.2d at 1216. *See also United States v. Adamo,* 534 F.2d 31 (3d Cir.), *cert. denied,* 429 U.S. 841, 97 S.Ct. 116, 50 L.Ed.2d 110 (1976).

■ Viewing the evidence in the light most favorable to the government, *Glasser v. United States, supra,* the following testimony by the informant Love and Agent Kutney is sufficient to establish that the jury could have found beyond a reasonable doubt both that a single conspiracy existed, and that the appellants, albeit at different times, were members of that conspiracy.

The informant, Love, testified that he mentioned the possibility of obtaining P–2–P while conversing with Boyd in May 1975. He stated that he met more than once with defendant D'Metri in the beginning of June and discussed P–2–P "connections." Love testified that he had almost daily contact with Boyd during the first half of June, during which time Boyd continued to talk of obtaining a source of supply for P–2–P in order to start a "laboratory." Love further testified that he met George Parr in the latter part of June, prior to any transactions involving P–2–P between Kutney and the defendants. At that time, Parr questioned Love about his source of P–2–P, asked about the quantity of the precursor available, and mentioned that "his lab was shut down at the time." At the time of the questioning of Love by Parr, Boyd was present. Parr named a price of $1000 per gallon for the precursor, and asked Love when it could be made available to him.

Love stated at trial that during July he had further conversations with Parr, often with Boyd present, in which Parr evidenced displeasure with the fact that Love's "supplier" of P–2–P had not yet appeared with the substance. Love and Boyd remained in almost daily contact, and D'Metri and Love continued to discuss the logistics of the methamphetamine manufacturing process.

On July 24, Love introduced Agent Kutney to Boyd. At that meeting, discussion centered on a partnership comprised of Boyd, Love, Kutney, D'Metri and one other individual. After the first, abortive attempt to manufacture methamphetamine, Marthana Heyman and appellant Lipton spoke with Love. Love testified that Lipton had then engaged someone else to take over the laboratory and run it. Love also stated that he had discussed the supply of P–2–P with Parr after the July 24 meeting with Kutney, Boyd and Love.

Agent Kutney's testimony confirms and supplements Love's account. After the Ridge Avenue laboratory failed, Parr told Kutney that he was aware of the poor quality of the product manufactured by the lab, but that he nevertheless had been able to sell it to users who injected it directly into their veins. Boyd informed Kutney that he had sold three of the six ounces made at the Ridge Avenue lab to Parr, and that Parr was selling this alleged methamphetamine to "shooters."

Later, Kutney spoke with Lipton, who indicated that he had provided the connection for the "chemist" to take over the laboratory. Kutney testified that Lipton offered to introduce him to the new chemist, who was being "brought in" because Parr, Love, Boyd and Kutney were dissatisfied with the results of the Ridge Avenue methamphetamine attempt. Lipton and Kutney then proceeded to Morrisville, Pennsylvania, where they met appellant Powell. The three discussed the manufacture of methamphetamine, Powell indicating that he had some doubts about a formula for the manufacture of the substance. Powell asked Kutney to check on two questions he had concerning the proper formula.

This evidence supports the government's contention that before and during the time period alleged in the indictment, Parr and Boyd, along with Love and Kutney, were engaged in an ongoing agreement to manufacture and distribute methamphetamine. During the course of the scheme, D'Metri, who had been an early member, was

dropped for failure to perform adequately as a "chemist," and Lipton and Powell entered the group to lend expertise that was lacking when the venture began. The jury could infer that Parr planned to utilize the Ridge Avenue operation as a source of supply, but that when it became apparent that the laboratory was unsuccessful, he acted with Boyd to ensure a supply with Lipton's and Powell's aid.

The testimony of Love and Kutney, if believed, provided sufficient evidence for the jury to find that Parr was aware of and involved in the Ridge Avenue attempt to manufacture methamphetamine for distribution. The jury could also have found Lipton and Powell were aware of the previous efforts of the conspiracy, knowingly entered the agreement, and contributed their efforts to its successful operation. Sufficient evidence supports a finding of a single conspiracy.

### B.

Appellant D'Metri contends that the trial judge abused his discretion by denying D'Metri's motion to sever his case, pursuant to Fed.R.Crim.P. 14, from the other defendants at trial. D'Metri initially moved for severance before trial, and renewed the motion during the presentation of the prosecution's case. The basis for his motions was that the proof would establish or had established the existence of two conspiracies instead of only one. D'Metri's argument in this Court and at trial is that since all the other defendants save himself were involved in the Bucks County group, he became the victim of "guilt transference" arising from the testimony offered against his co-defendants.

■ Motions for severance are addressed to the sound discretion of the trial judge, and his decision will not be reversed in the absence of a showing of abuse of that discretion. *United States v. Somers*, 496 F.2d 723 (3d Cir.), *cert. denied*, 419 U.S. 832, 95 S.Ct. 56, 42 L.Ed.2d 58 (1974); *United*

*States v. Barrow*, 363 F.2d 62 (3d Cir. 1966), *cert. denied*, 385 U.S. 1001, 87 S.Ct. 703, 17 L.Ed.2d 541 (1967). D'Metri thus is faced with the "heavy burden" of showing that the trial judge exceeded the bounds of his discretionary authority, *United States v. Sica*, 560 F.2d 149 (3d Cir.), *cert. denied*, 434 U.S. 862, 98 S.Ct. 191, 54 L.Ed.2d 135 (1977). Concerning a motion for severance under Fed.R.Crim.P. 14, we have stated that

a primary consideration is whether the jury can reasonably be expected to compartmentalize the evidence as it relate[d] to separate defendants in view of its volume and limited admissibility.

*United States v. DeLarosa*, 450 F.2d 1057 (3d Cir. 1971), *cert. denied*, 405 U.S. 927, 92, 1065 S.Ct. 978, 30 L.Ed.2d 800 (1972). *See United States v. Somers, supra.*

■ From our review of the trial record, we do not see any unfairness to D'Metri arising from his joinder with the other defendants. D'Metri's contention of a "spill over" of incriminating evidence is countered by the evidence of a single conspiracy in which he played a part and by the trial judge's instructions specifically directing the jury to evaluate each defendant's guilt or innocence individually. The government's interest in conducting joint trials involving a legitimate conspiracy count further outweighs D'Metri's desire to separate himself from his co-defendants. *See United States v. Segal*, 534 F.2d 578, 583 (3d Cir. 1976). Thus, on the record before us, we find no abuse of discretion in the trial judge's denials of D'Metri's motions.

### III.

■ The appellants' second contention is, however, a substantial one. The indictment on which the defendants were tried alleges a conspiracy to manufacture and distribute methamphetamine "[f]rom on or about July 24, 1975 to on or about October 25, 1975." No overt act is alleged to have occurred in furtherance of that conspiracy later than September 29, 1975.[3] In its attempt to

---

**3.** There were also substantive counts of specific distributions of methamphetamine on specif-

ic occasions. The Goff Testimony, which dealt with an ingredient in the manufacturing proc-

establish the charged conspiracy, the government offered the testimony of Agent Kutney and informant Love that between the dates recited in the indictment Kutney supplied the conspirators with P–2–P. That evidence clearly was relevant to the charge of a conspiracy to manufacture methamphetamine. Later in the trial, however, the court admitted the testimony of Trooper Goff, an undercover officer of the Pennsylvania State Police, that on three dates after the expiration of the conspiracy charged in the indictment he had discussed with defendant Lipton a purchase of P–2–P, and that on one date more than two months after the conspiracy ended he had met with defendant Parr for a similar purpose. The government's intention in offering Goff's testimony is disclosed in its brief:

> In the first instance, it cast light on the relationship existing between Michael Lipton and George Parr. Since the Government's case against Lipton and Parr rested largely on Agent Kutney's testimony, both the existence and the nature of this relationship were of critical importance to Agent Kutney's credibility. Secondly, this testimony helped establish a modus operandi further implicating Lipton and Parr in the prior methamphetamine manufacturing scheme. In both circumstances Lipton and Parr were willing to pay both money and drugs to secure the needed precursor, phenyl-2-propanone.

Appellee's Brief 13. The testimony was offered, in other words, to establish that because Lipton and Parr were willing to purchase P–2–P in December, 1975, and January, 1976, they must have been willing to do so, as Kutney testified, in the preceding July and August.

The trial court declined to admit the testimony on that theory. That ruling was correct. Even recognizing that time and space are only relative concepts, we have not yet come to the point where the government, in meeting an anticipated entrapment contention, can show predisposition by subsequent activity. But the trial court nevertheless admitted the testimony under rule 404(b) of the Federal Rules of Evidence [4] to show "intent or knowledge or common type of plan or scheme." Notes of Testimony 10–13; see also id. 10–134. The government's alternative theory of admissibility, which the court accepted, was that Goff's evidence of a *subsequent* crime is relevant to the existence of the *prior* conspiracy to manufacture methamphetamine. The logic of showing prior intent or knowledge by proof of subsequent activity escapes us. Nor do we understand how, logically, a post-conspiracy purchase of a chemical ingredient tends to prove the *modus operandi* of the prior manufacturing operation.

The government relies on the Second Circuit case of *United States v. Warren*, 453 F.2d 738 (2d Cir.), *cert. denied*, 406 U.S. 944, 92 S.Ct. 2040, 32 L.Ed.2d 331 (1972), for the proposition that evidence of subsequent crimes is admissible. *Warren*, however, involved only the admissibility of evidence obtained in a search conducted after the filing of the indictment. The evidence established prior similar crimes, and was admitted to show prior intent to violate the law and thus to negate the defense of entrapment. The government also relies on the decision of a divided court in *United States v. Laurelli*, 293 F.2d 830 (3d Cir. 1961), *cert. denied*, 368 U.S. 961, 82 S.Ct. 406, 7 L.Ed.2d 392 (1962), which concededly authorizes the admission of evidence of some subsequent events to prove prior intent. But Judge Kalodner in dissent makes what is for us, at least, a far more logical argument against the admissibility of such evidence. If *Laurelli* was controlling we

---

ess, was in no way relevant to those specific distributions. If it was admissible at all, it was relevant only to the charge of conspiracy to manufacture.

**4.** Fed.R.Evid. 404(b) states:

    (b) Other Crimes, Wrongs, or Acts.

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

would suggest taking this case *en banc* and overruling it. But *Laurelli* is, for present purposes, distinguishable. The evidence of subsequent events was offered to prove a specific tender of a bribe to a government inspector. The subsequent events tended to show that the bribe offer was part of an ongoing course of conduct with respect to the performance of a specific government contract. Thus, the evidence in *Laurelli* was more closely analogous to evidence of overt acts taking place during the course of a continuing conspiracy. *Laurelli* would be more directly in point if the other crimes had occurred during the performance of a different government contract. In this case, the trial court ruled, and the government concedes, that the conspiracy was over when the dealings with Goff occurred. Thus the other crimes were part of an entirely different conspiracy.

In a response to the defendants' petition for rehearing the government also attempts to justify the trial court's ruling on the authority of *United States v. Miles*, 468 F.2d 482, 489–90 (3d Cir. 1972), and *United States v. Gimelstob*, 475 F.2d 157, 160 (3d Cir.), *cert. denied*, 414 U.S. 828, 94 S.Ct. 49, 38 L.Ed.2d 62 (1973). The former authorizes admission of evidence of post-crime flight, and the latter of post-crime threats against the life of a potential witness. Those authorities stand, however, for the proposition that evidence of consciousness of guilt is admissible, just as a post-crime admission of guilt would be. Goff's testimony was not offered to prove consciousness of guilt of the conspiracy charged in the indictment and does not tend to do so.

Finally, the government relies on cases such as *United States v. Kenny*, 462 F.2d 1205, 1219 (3d Cir.), *cert. denied*, 409 U.S. 914, 93 S.Ct. 233, 34 L.Ed.2d 176 (1972) and *United States v. Miles, supra*, 468 F.2d at 489–90. The former authorizes admission of evidence of sudden and unexplained acquisition of wealth, and the latter of unexplained possession of stolen goods. In those cases the evidence was relevant because possession of the fruits of a theft tends to show that the defendant was a participant in the crime. Had Goff's testimony estab-

lished, for example, possession of the fruits of the prior illegal manufacturing operation, it might well have been admissible under the subsequent possession authorities. But on this record Goff's testimony was other crimes evidence pure and simple. It was not materially different from an attempt to prove a robbery in August by evidence of an unrelated robbery in January. It was relevant only if the jury could have drawn the inference that the subsequent crime evidenced a prior propensity toward criminal activity, and that, of course, is the one inference that other crimes evidence may not be admitted to support. The admission of Goff's testimony was thus reversible error. *See, e. g., United States v. Dansker*, 537 F.2d 40 (3d Cir. 1976), *cert. denied*, 429 U.S. 1038, 97 S.Ct. 732, 50 L.Ed.2d 748 (1977).

The trial court gave an instruction limiting the use of Goff's testimony to Parr and Lipton, and to the specific purpose of proving that they were members of the conspiracy. Once Parr and Lipton were connected to the conspiracy, however, their out-of-court admissions could be considered by the jury against the codefendants. Thus the court's admonitory instruction was, we believe, wholly ineffective in insulating the codefendants from the prejudicial effects of Goff's testimony.

The judgment of the district court will be reversed as to all defendants, and the case remanded for a new trial.

JAMES HUNTER, III, Circuit Judge, concurring:

I fully join the court in Parts I and II of the opinion. As to Part III, which relates to the admissibility of the testimony of Trooper Goff, I would make clear that I do not read the court as holding that evidence of subsequent crimes is, under all circumstances, inadmissible.

However, in this case the majority makes a sound argument for the non-relevancy of the Goff testimony. Therefore, I concur.