UNITED STATES of America

v.

Donald TAYLOR, Sherman Curl, James Williams.

Crim. Nos. 79–13–1, 79–13–2 and 79–13–4.

United States District Court, E. D. Pennsylvania.

May 29, 1979.

Peter F. Vaira, U. S. Atty., John E. Riley, Asst. U. S. Atty., Philadelphia, Pa., for plaintiff.

Robert B. Mozenter, Philadelphia, Pa., for Williams.

Stephen H. Serota, Philadelphia, Pa., for Taylor.

Gerald Jay Pomerantz, Philadelphia, Pa., for Curl.

## MEMORANDUM

RAYMOND J. BRODERICK, District Judge.

Defendants, Donald Taylor, Sherman Curl and James Williams, were found guilty by a jury on a two-count indictment charging all three defendants in Count I with conspiracy to manufacture and distribute methamphetamine in violation of 21 U.S.C. § 846 and charging Williams in Count II with using a communication facility in facilitating a conspiracy to manufacture methamphetamine in violation of 21 U.S.C. § 843(b). Defendant Curl filed a motion for arrest of judgment. All three defendants filed motions for judgment of acquittal and/or a new trial. Oral argument was had on the motions. The Court has considered these motions without the benefit of a transcript. For the reasons hereinafter set forth, defendants' motions will be denied.

1. Rule 34 provides in pertinent part:

The court on motion of a defendant shall arrest judgment if the indictment . . .

I. *Defendant Curl's Motion for Arrest of Judgment.*

Defendant Curl has filed a motion for arrest of judgment, pursuant to Fed.R.Crim.P. 34,[1] alleging that the indictment was vague, indefinite and ambiguous, did not sufficiently set forth the alleged offenses sought to be charged against the defendant, and did not adequately apprise the defendant of the crime or crimes charged. We find that the indictment is sufficient as a matter of law to charge the offense of conspiracy under 21 U.S.C. § 846. Count I of the indictment, in which the crime of conspiracy is charged, lists the date of the offense, tracks the language of the statute under which the violation is alleged, 21 U.S.C. § 846, and cites the specific statutes which the defendant was charged with having conspired to violate. Finally, the indictment lists numerous, detailed overt acts alleged to have been committed in furtherance of the conspiracy. These overt acts are of sufficient detail to advise Curl of the offense with which he is charged. The indictment is clearly sufficient as a matter of law to charge Curl with the offense of conspiracy. *United States v. Miah*, 433 F.Supp. 259 (E.D.Pa.1977), aff'd, 571 F.2d 573 (3d Cir. 1978); *see United States v. Hudson*, 422 F.Supp. 395 (E.D.Pa.1976), *aff'd*, 556 F.2d 566 (3d Cir.), *cert. denied*, 431 U.S. 922, 97 S.Ct. 2194, 53 L.Ed.2d 236 (1977). As the indictment charges the defendant with violating laws of the United States within this District, this Court has jurisdiction of the offense charged. 18 U.S.C. § 3231. Because the indictment clearly charges an offense of which this Court has jurisdiction, defendant's motion in arrest of judgment must be denied. *United States v. Miah, supra; United States v. McDaniel*, 75 F.R.D. 454 (W.D.Okl. 1977).

II. *Defendants' Motions for Judgment of Acquittal.*

In support of their motions for judgment of acquittal, the defendants contend that

does not charge an offense or if the court was without jurisdiction of the offense ·charged.

the verdicts were contrary to the weight of the evidence and were not supported by substantial evidence.[2] We find that the evidence produced at trial, viewed in the light most favorable to the government, *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942); *United States v. Armocida,* 515 F.2d 29, 46 (3d Cir.), *cert. denied,* 423 U.S. 858, 96 S.Ct. 111, 46 L.Ed.2d 84 (1975), is more than sufficient to support the verdicts. The evidence presented at trial, viewed in the light most favorable to the government, may be summarized as follows.

■ Around October, 1976, Alfred Moore contacted the defendant Williams in an attempt to obtain from Williams phenyl–2–propanone (P–2–P), the principal precursor chemical used in the manufacture of methamphetamine. In November of that year, Williams told Moore that he could obtain P–2–P, and an agreement was reached pursuant to which Williams would give one bottle of P–2–P to Moore, who, in return, would give Williams 8 ounces of the methamphetamine manufactured from the P–2–P. Williams gave Moore a bottle of P–2–P at Williams' store at 2349 W. Thompson Street. Meanwhile, Moore contacted defendant Taylor, who assured him that he could make methamphetamine. Taylor and Moore reached an agreement that in exchange for one bottle of P–2–P from Moore, Taylor would manufacture methamphetamine from the P–2–P and give to Moore 12 ounces of methamphetamine, 8 ounces of which Moore would give to Williams. Moore took the bottle of P–2–P he had received from Williams to Taylor, who, after smelling it, said that it was what he needed to make methamphetamine. One week later, Moore met with Taylor and the defendant Curl, and the three of them proceeded to a store in Northeast Philadelphia, where they purchased a crock pot, which Taylor stated, in Curl's presence, he would use in making the methamphetamine. Two days later, Taylor delivered to Moore three

envelopes, each containing 4 ounces of methamphetamine, two of which Moore delivered to Williams, and one of which Moore sold for between $300 and $750 per ounce.

The same arrangement was followed about three weeks later: Williams gave Moore one bottle of P–2–P, which Moore delivered to Taylor, who, within a few days, gave Moore 12 ounces of methamphetamine. Moore gave Williams 8 ounces and sold the remaining 4 ounces at approximately $300 per ounce.

In the spring of 1977, Williams told Moore that he could get more P–2–P. They agreed on an exchange of one bottle of P–2–P for 8 ounces of methamphetamine. Moore delivered the bottle of P–2–P to Curl who gave it to Taylor. Taylor encountered some problems with drying out the methamphetamine he manufactured from this particular bottle of P–2–P, and Moore took Taylor to meet Williams at the store on Thompson Street. Moore introduced Taylor as the man who did the manufacturing and Williams as the man who supplied the P–2–P. A few days later, Curl called Moore and said that the methamphetamine was ready. Moore proceeded to the meeting place designated by Curl and found Williams, who said that he was supposed to meet Taylor there. Taylor and Curl arrived a few minutes later. Curl drove Moore around the block and gave him 3 ounces of methamphetamine, explaining that they had come up short because of the problems with drying out the methamphetamine.

Sometime in May, 1977, Moore agreed to give Officer Henry Cunningham, an undercover police officer, one ounce of methamphetamine or $500 for one bottle of P–2–P. Moore, having only $175, asked both Taylor and Curl for the ounce of methamphetamine or the $325 he needed to obtain the P–2–P from Cunningham. Cunningham eventually gave Moore the bottle of P–2–P in return for Moore's promise to give him 2 ounces of methamphetamine. In Curl's presence, Moore gave the P–2–P to Taylor

**2.** The Court notes that the defendants Taylor and Curl raised these contentions in motions for a new trial. We have considered these contentions as if they were raised in a motion for acquittal and deny the motion for the reasons stated herein.

and told Taylor to keep one half of the methamphetamine he manufactured from the P–2–P. Moore became suspicious of Cunningham and, upon Taylor's advice, did not contact him further. After three or four weeks, Taylor told Moore that the methamphetamine did not turn out.

Moore next met Taylor in February, 1978, at which time Taylor promised that he would have 8 ounces of methamphetamine up front for Moore in return for a bottle of P–2–P. Taylor did not mention where he would get the methamphetamine but told Moore that he had been coming out of the J. T. Baker Chemical Co. (J. T. Baker) in Philipsburg, New Jersey with a quantity of P–2–P when Drug Enforcement Administration (DEA) agents seized it. Taylor also told Moore that he had met with Williams, who wanted to learn how to manufacture methamphetamine.

The government introduced various work orders, receiving memos, customer purchase orders and other records maintained by J. H. Berge, Inc., the Arthur H. Thomas Company (A. H. Thomas) and J. T. Baker which indicate that orders for various chemicals, including P–2–P, tubing and a condenser were placed by the Goode & Jacobs Plastics Co., the Don Sherman Corporation, the James Williams Exterminating Co. and other companies. The phone number given by the customer ordering 5 bottles of P–2–P from J. H. Berge, Inc. on August 8, 1978 was that of Darlene Taylor, the sister of defendant Taylor. Several orders for P–2–P placed by the Goode & Jacobs Plastics Co. with A. H. Thomas from May, 1977 to April, 1978 listed the phone number of defendant Curl as that of the company placing the order. Certain of the receiving memos were signed Sherman Curl and/or Donald Taylor. Mr. Joseph Cici, the order filling department manager at A. H. Thomas, identified Donald Taylor as the man who had picked up certain of these orders. Three orders for P–2–P, methylamine and mercuric bromide were placed with A. H. Thomas by the James Williams Exterminating Co. in September, October and December of 1977. The address and phone number given for the James Williams Extermi-

nating Co. in connection with these orders were the address and phone number of defendant Williams' store at 2349 W. Thompson Street. In connection with one of the orders which was called in, the records of A. H. Thomas reflect that the caller gave the name of James Williams. After defendant Williams picked up one of the orders at A. H. Thomas on October 28, 1977, he was stopped by DEA agents and was taken to DEA headquarters where he admitted that he was using P–2–P not for exterminating purposes but for selling it to others for the manufacture of methamphetamine.

Orders for P–2–P and two propanol placed by the Don Sherman Corp. at J. T. Baker were in the names of Donald Taylor or Sherman Curl. The records indicate that one of the orders was picked up by Donald Taylor. The telephone number listed on the orders for the Don Sherman Corp. was defendant Curl's number. No corporation was found to exist at the address given for the Don Sherman Corp. Defendant Taylor picked up one of the orders on January 9, 1978. One order for 50 bottles of P–2–P was placed with J. T. Baker in October, 1977 by Best Services Corp. and was picked up by defendant Williams on November 1, 1977.

Clarence Gardner, a confidential government informant, saw Williams in New Orleans in September, 1978. Williams told Gardner that he had made $300,000 selling methamphetamine, but that he was having a problem obtaining "oil", the street name for P–2–P. On September 21, 1978, Gardner spoke to Williams by telephone and arranged to deliver a case of P–2–P to Williams. On September 22, 1978, Williams phoned Gardner at the Ramada Inn in Essington, Pennsylvania, and arrangements were made for Williams to pick up six bottles of P–2–P. Williams gave Gardner $5400 for the six bottles of P–2–P and told Gardner that he was putting the P–2–P to work that night to make methamphetamine. Williams also told Gardner that he wanted more P–2–P and agreed to sell Gardner a pound of the methamphetamine manufactured from the six bottles of P–

2–P for $5000. The government, with Gardner's consent, made tape recordings of the conversations between Williams and Gardner, together with a moving picture of the transfer of the P–2–P from Gardner to Williams.

Defendant Williams, after being arrested on January 19, 1979, admitted receiving the six bottles of P–2–P from Gardner and stated that he had delivered these six bottles to a Merrill Ferguson, who used the P–2–P to manufacture methamphetamine. He stated that he did not sell one pound of methamphetamine to Gardner in accordance with their agreement because the word was out that Gardner was a confidential government informant.

Agent Compton arrested Taylor on January 17, 1979, at which time he found two pieces of paper on the floor of the car Taylor was driving. These pieces of paper contained various notations, including the name Goode & Jacobs Plastic Co., the words "phenyl acetone" (another name for P–2–P), the name "Don Williams" (which was also on the purchase order for five bottles of P–2–P from J. H. Berge, Inc.), and the word "cinnamaldehyde" (which is a chemical that can be used in manufacturing methamphetamine).

Defendant Curl was arrested on January 17, 1979 at his home. At a DEA office later that morning, Curl admitted that during a certain period of time he had participated in the manufacture of methamphetamine by ordering chemicals. He also admitted that he dealt with Alfred Moore and made deliveries of methamphetamine.

The government presented the expert testimony of a forensic analytical chemist who testified that P–2–P and phenyl acetone are the same chemical and that P–2–P is the basic ingredient in the manufacture of methamphetamine. Two propanol, another name for isopropyl alcohol, mercuric bromide and methylamine are also chemicals used in the manufacture of methamphetamine. He testified further that he knew of no use for P–2–P other than the manufacture of methamphetamine and certain pharmaceuticals and that he knew of no laboratories in the Philadelphia area using P–2–P legitimately.

The government's case was strong, and there can be no doubt that the evidence was amply sufficient to support the jury's verdict as to each of the three defendants on Count I and as to Williams on Count II. We, therefore, reject the defendants' contentions that the evidence produced at trial was insufficient to support the verdicts of the jury.

III. *Defendants' Motions for a New Trial.*

The defendants make the following allegations of error in support of their motions for a new trial:

1. Defendant Taylor contends that the Court erred in failing to grant his motion for severance.

2. Defendant Taylor contends that the Court erred in denying his pretrial motion to suppress evidence concerning a search and seizure on January 9, 1978 by Agent Compton and statements made by defendant Taylor in connection therewith.

3. Defendant Taylor contends that the Court erred in denying his pretrial motion to suppress evidence concerning a search and seizure at the time of his arrest on January 17, 1979.

4. Defendant Taylor contends that the Court erred in denying his various motions for a mistrial during the course of the trial, and, in particular, his motion for a mistrial in connection with testimony of Agent Compton which summarized a statement by defendant Curl.

5. Defendant Williams contends that the Court erred in denying his pretrial motions to suppress evidence of taped conversations due to lack of consent.

6. Defendant Curl contends that the Court erred in denying his pretrial motion to suppress a post-arrest statement made by him to Agent Compton.

7. All three defendants contend that the Court erred in denying a pretrial motion to dismiss the indictment because multiple conspiracies were charged in the indictment

and because the government presented evidence at trial of more than one conspiracy.

8. Defendant Williams contends that a new trial should be granted based on newly discovered evidence.

## 1. Defendant Taylor's Motion for Severance.

■ The defendant, Taylor, claims that the Court erred in denying his pretrial motion for severance pursuant to Rule 14 of the Federal Rules of Criminal Procedure. Specifically, Taylor claims that he suffered actual prejudice as a result of his being implicated by a post-arrest statement ·of defendant Curl[3] and by the quantum of evidence introduced against his codefendants. The Court denied Taylor's pretrial motion inasmuch as the conspiracy alleged did not appear so complex nor the actors so numerous that the evidence against each defendant could not be kept separate in the minds of the jurors, because the defendant had not made a showing of the likelihood of a codefendant testifying on his behalf, and because judicial economy weighed heavily in favor of trying all of the defendants in a single trial. Order, ¶ 4, Cr.No. 79–13–1 (April 3, 1979); see *United States v. Boscia*, 573 F.2d 827 (3d Cir.), *cert. denied*, 436 U.S. 911, 98 S.Ct. 2248, 56 L.Ed.2d 411 (1978); *United States v. Rosa*, 560 F.2d 149 (3d Cir. 1977), *cert. denied*, 434 U.S. 862, 98 S.Ct. 191, 54 L.Ed.2d 135 (1978). Having heard the evidence at trial, and having carefully instructed the jury concerning the admissibility of certain evidence,[4] the Court finds that its pretrial ruling was correct. That the jury acquitted the defendant Reid of the conspiracy charged in Count I of the indictment is an indication that the jurors were in fact able to compartmentalize the evidence introduced at trial. Therefore, the defendant Taylor's contention that the

Court erred in denying his pretrial motion for severance is without merit.

## 2. Defendant Taylor's Motion to Suppress Evidence and Statements of January 9, 1978.

Prior to trial, defendant Taylor moved to suppress evidence seized from the trunk of the vehicle in which he was a passenger on January 9, 1978.[5] The testimony at the pretrial suppression hearing can be summarized as follows: On January 9, 1978, DEA agents, pursuant to surveillance at J. T. Baker, observed Taylor purchasing certain chemicals and placing them in the trunk of the vehicle. The agents followed the vehicle on Route 22 from New Jersey into Pennsylvania. Agent Compton stopped the vehicle and asked the driver for identification and proof of ownership. The driver produced an expired driver's license in the name of Donald Wilson and related that the car was a leased vehicle. Shortly thereafter, the driver stated · that his name was Charles Ragin. Taylor produced no identification. Agent Compton instructed Ragin to follow him to the nearest Pennsylvania State Police barracks, where Agent Compton verified the identity of Charles Ragin and Donald Taylor and confirmed that Ragin had been given permission to use the vehicle by the lessee, Karen Lester. Agent Compton thereafter seized the chemicals from the trunk of the vehicle and permitted Ragin and Taylor to proceed. The total elapsed time from the original stop of the vehicle was less than 1½ hours.

Defendant Taylor contends that the seizure of the chemicals from the trunk of the vehicle violated his right under the Fourth Amendment to be free from unreasonable searches and seizures and, consequently, moved to suppress such chemicals. The government contends that defendant Taylor

3. The Court has discussed this allegation in connection with his motion for a mistrial concerning the admissibility of defendant Curl's post-arrest statement. *See* Section III(4) *infra*.

4. The Court has discussed these cautionary instructions in connection with the allegation that the Court erred in denying defendants'

motion to dismiss based on multiple conspiracies. *See* Section III(7) *infra*.

5. Taylor also contends that the statements he allegedly made at the police barracks should be suppressed as the fruits of the stop and search of the automobile, which he contends were illegal.

lacked standing to contest the search and seizure and that there were both probable cause and exigent circumstances justifying the seizure.[6] We agree with both contentions of the government.

Until recently, a defendant had standing to contest searches and seizures where he was legitimately on the premises at the time of the search; where he had a legitimate proprietary or possessory interest in the premises searched, or where he was charged with an offense that includes as an essential element possession of the item seized. *E.g., Brown v. United States,* 411 U.S. 223, 230, 93 S.Ct. 1565 (1970); *Jones v. United States,* 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960). The Supreme Court, in the recent case of *Rakas v. Illinois,* 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978), re-examined the standing doctrine in the context of a passenger in an automobile. In *Rakas,* the Court stated that the phrase "legitimately on the premises" creates too broad a gauge for measurement of Fourth Amendment rights and should not be applied in that case with respect to Fourth Amendment claims of automobile passengers. *Id.* at 132, 99 S.Ct. at 424. Specifically, the Court held that passengers who asserted neither a property nor a possessory interest in the automobile searched nor an interest in the property seized and who failed to show that they had any legitimate expectation of privacy in the glove compartment or area under the seat of the car in which they were passengers, were not entitled to challenge a search of these areas. *Id.* at 134, 99 S.Ct. 425.

In the case presently before the Court, defendant Taylor was merely a passenger in a car leased and driven by other people. He claims neither a property nor a possessory interest in the automobile. Although Taylor purchased the chemicals seized from the automobile, possession of those chemicals is not an essential element

of the offense charged—conspiracy to distribute and manufacture methamphetamine. Thus, Taylor does not claim an interest in the property seized sufficient to confer standing to contest the search. Finally, Taylor has not demonstrated any legitimate expectation of privacy in the trunk of the automobile in which he was a passenger. In fact, the Supreme Court, in discussing whether the petitioners in *Rakas* had any legitimate expectation of privacy in the glove compartment or area under the seat of the car in which they were merely passengers, stated that "Like the trunk of an automobile, these are areas in which a passenger *qua* passenger simply would not normally have a legitimate expectation of privacy." *Id.* The defendant, Taylor, did not present any evidence at the pretrial hearing showing that he had a legitimate expectation of privacy in the trunk of the car. Thus, under the recent Supreme Court pronouncement in *Rakas,* it is clear that Taylor lacks standing to contest the search of the automobile in which he was a passenger and the seizure of the chemicals from the trunk in connection therewith. Therefore, the defendant Taylor's motion to suppress was properly denied.

Even if Taylor has standing to challenge the search of the automobile, his motion to suppress was nevertheless properly denied because the search and seizure were reasonable under the Fourth Amendment.

The Supreme Court in *Chambers v. Maroney,* 399 U.S. 42, 51, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970), relying on *Carroll v. United States,* 267 U.S. 132, 153, 45 S.Ct. 280, 69 L.Ed. 543 (1925), held that where probable cause exists to seize an automobile, a search may be made without a warrant where the car is movable and the evidence sought may be lost in the time it would take to secure a warrant. *Chambers* extended the exigent circumstances doctrine to include a later search at the police

---

**6.** The government also contends that the search and seizure of the vehicle was proper pursuant to the federal seizure provisions of 21 U.S.C. § 881. Because we agree with the government that defendant Taylor lacks stand- ing to contest the search and seizure and that there were probable cause and exigent circumstances justifying the search, we need not discuss this third contention of the government.

station. 399 U.S. at 52 and n.10, 90 S.Ct. 1975. However, warrantless searches permissible under the doctrine of exigent circumstances are not without limits. As stated by the Third Circuit in *United States v. Valen*, 479 F.2d 467, 471 (3d Cir. 1973), *cert. denied*, 419 U.S. 901, 95 S.Ct. 185, 42 L.Ed.2d 147 (1974), "*Chambers* makes clear that the right to search which attaches at the time of seizure, continues to exist for a reasonable time after the seizure." *See United States v. Vento*, 533 F.2d 838, 866 (3d Cir. 1976); *United States v. Dento*, 382 F.2d 361, 366 (3d Cir.), *cert. denied*, 389 U.S. 944, 88 S.Ct. 307, 19 L.Ed.2d 299 (1967); *cf. Mincey v. Arizona*, 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978). Thus, we are faced with two separate determinations, first whether exigent circumstances existed to permit the warrantless seizure, and second, whether pursuant to this doctrine the warrantless search was conducted within a reasonable time after the seizure. *See United States v. Chadwick*, 433 U.S. 1, 97 S.Ct. 2476, 2486, 53 L.Ed.2d 538 (1977).

■ The Third Circuit in *Valen* established a two-prong test for a warrantless search and seizure under exigent circumstances: (1) probable cause to make the search; and (2) reasonable possibility of the agent's loss of dominion and control over the object to be searched and the consequential loss of the contraband. 479 F.2d at 470.

In the instant case probable cause existed for the DEA agents to believe that the automobile contained chemicals that were intended to be used in the illegal manufacture of methamphetamine. At the suppression hearing, Agent Compton testified that he commenced surveillance of J. T. Baker in the morning of January 9, 1978. He saw Taylor and Ragin arrive in a Chevrolet Monte Carlo and later load three cardboard boxes into the trunk of that vehicle. From information received from Bruce Frace, an employee of J. T. Baker, Agent Compton was aware that these boxes contained 10 bottles of P–2–P and quantities of methylamine and two propanol, which Taylor had previously ordered in the name of Don

Sherman Corp. Agent Compton had earlier been notified by a Mr. Norton Euart, head of security at J. T. Baker, concerning this order, and arrangements had been made for the surveillance of the pickup of the order. Prior to January 9th, Agent Compton determined that the Don Sherman Corp. was not located at the address given for that company by Taylor in connection with the order. Furthermore, the phone number given for Don Sherman Corp. was really that of a Claudette Brown, who, Agent Compton had been informed by another officer, had been investigated by a Philadelphia narcotics unit in the summer of 1976 which seized an illegal methamphetamine manufacturing unit from an apartment rented by Ms. Brown. During the search of that apartment, the name and address of a Donald Jackson, believed to be the same person as Donald Taylor, were found on a telephone bill. In addition, Agent Compton testified that he had seen Taylor on a previous occasion, on June 24, 1977, in connection with negotiations between Officer Cunningham and Alfred Moore for the exchange of P–2–P for methamphetamine. On that day, Officer Cunningham gave Moore a bottle of P–2–P for $175 and Moore's promise to deliver a certain quantity of methamphetamine. Agent Compton saw Moore, with the bottle of P–2–P, enter an automobile in which Taylor was a passenger and subsequently leave the car without the bottle. Agent Compton followed the car to several locations, including the address of the apartment rented in Claudette Brown's name—the address to which the phone number given by Taylor as the phone number for the Don Sherman Corp. was registered. Agent Compton had also been informed by a confidential informant in May, 1977 that a clandestine laboratory chemist active in the illegal manufacture of methamphetamine, whose girlfriend was Claudette Brown, was named Donald "Duck", the nickname of defendant Taylor.

When Ragin and Taylor arrived at J. T. Baker on January 9, 1978, Agent Compton testified they signed in using their correct names, although Ragin wore a nameplate with the name of Donald Wilson. Dennis

Euart, a security guard at J. T. Baker, informed Agent Compton that Taylor had visited J. T. Baker on January 6, 1979 and, when signing in on that date, provided an incorrect license tag and used the name William Brown.

 The circumstances related above clearly gave Agent Compton probable cause to search the automobile for the chemicals contained in the trunk.[7] Therefore, the first prong of the two-prong test set forth in *United States v. Valen, supra,* for a warrantless search and seizure under exigent circumstances is satisfied, inasmuch as there was probable cause to make the search. The second prong—that there be a reasonable possibility of the agent's loss of dominion and control over the object to be searched and the consequential loss of the evidence—is also satisfied. The evidence was in the trunk of an automobile. As in *Chambers, supra,* the car was movable and the evidence sought could be lost in the time it would take to secure a warrant. Thus under the *Valen* test there were exigent circumstances justifying the warrantless seizure of the chemicals.[8] The fact that the search was conducted at the police station does not invalidate the search, for *Chambers* extended the exigent circumstances doctrine to include a later search at the police station. 399 U.S. at 52 and n.10, 90 S.Ct. 1975. We find that the search and seizure in the instant case, which took place within 1½ hours of the initial stop, occurred within a reasonable time. *United States v. Vento,* 533 F.2d 838, 866 (3d Cir. 1976).

 Taylor also contends that because the chemicals seized from the trunk of the automobile could be legally purchased by anyone, they were not contraband and,

therefore, they were not subject to seizure. The Supreme Court, however, in *Warden v. Hayden,* 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967), stated:

> [I]t is reasonable, within the terms of the Fourth Amendment, to conduct otherwise permissible searches for the purpose of obtaining evidence which would aid in apprehending and convicting criminals. The requirements of the Fourth Amendment can secure the same protection of privacy whether the search is for "mere evidence" or for fruits, instrumentalities or contraband. There must, of course, be a nexus—automatically provided in the case of fruits, instrumentalities or contraband—between the item to be seized and criminal behavior. Thus in the case of "mere evidence," probable cause must be examined in terms of cause to believe that the evidence sought will aid in a particular apprehension or conviction. *Id.* at 307, 87 S.Ct. at 1650.

In the instant case, the nexus between the chemicals and the illegal manufacture of methamphetamine was clearly provided by Agent Compton's knowledge of Taylor's connection with the controlled delivery of P–2–P by Officer Cunningham to Alfred Moore on June 29, 1977 and the intended exchange of that P–2–P for methamphetamine, by Taylor's connection with Claudette Brown, in whose apartment an illegal laboratory used for the illicit manufacture of methamphetamine had been seized by narcotics agents, by Taylor's use of a false address and the phone number of Claudette Brown for the Don Sherman Corp., by his use of an incorrect license plate and false name during his January 6, 1978 visit to J. T. Baker, and by Agent Compton's knowl-

---

7. It is also clear that the stop of the automobile by Agent Compton was not a random stop in accordance with the recent Supreme Court decision in *Delaware v. Prouse,* — U.S. —, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979).

8. The Court notes that the testimony adduced at the suppression hearing did not establish that Agent Compton should realistically have anticipated the vehicle which would be used by Ragin and Taylor, and who would make the pickup, even though he knew when the chemi-

cals would probably be picked up from J. T. Baker. Accordingly, we conclude that the failure to obtain a warrant, under such circumstances, was reasonable. *See United States v. Vento,* 533 F.2d 838, 865–66 (3d Cir. 1976); *United States v. Thrower,* 442 F.Supp. 272, 279 n.7 (E.D.Pa.1977), *aff'd,* 568 F.2d 771 (3d Cir. 1978). The record does not support the conclusion that Agent Compton attempted to evade the warrant requirement, nor that he attempted to exploit predictable "exigent circumstances".

edge that the chemicals purchased were all precursor chemicals in the manufacture of methamphetamine. Thus, it is clear from the record that the initial stop of the automobile and the subsequent search and seizure at the police barracks were proper. Taylor's motion to suppress the chemicals seized, therefore, was properly denied. Inasmuch as Taylor's motion to suppress the statements he made at the police station on January 9, 1978 was based solely on his contention that such statements were the fruits of an illegal stop, search and seizure, that motion was likewise properly denied. Thus, defendant Taylor's contention that the Court erred in denying these pretrial motions to suppress is without merit.

3. *Defendant Taylor's Motion to Suppress Evidence Seized on January 17, 1979.*

Defendant Taylor contends that the Court erred in denying his motion to suppress certain pieces of paper seized by Agent Compton from the floor of the automobile which Taylor was driving at the time Agent Compton arrested him on January 17, 1979. Testimony at the pretrial hearing concerning this seizure can be summarized as follows: On January 17, 1979, Agent Compton stopped Taylor, who was driving an automobile, approached him and, with a warrant for his arrest, placed him under arrest. After placing Taylor, handcuffed, in the back of the police vehicle, Agent Compton, in attempting to move Taylor's car, which was blocking a driveway, noticed two pieces of paper folded together on the floor in front of the passenger seat. Upon seeing the words "cinnamaldehyde" and "phenyl acetone" on the pieces of paper, Agent Compton seized the papers.

 Under *Coolidge v. New Hampshire*, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971), if there is a prior justification for an intrusion, an officer may seize any article of incriminating character if he comes upon it inadvertently and it is in plain view. There can be no question that Agent Compton's intrusion into the car was justified by his arrest of Taylor and his need to move the car so that it did not block the driveway. It is also clear from the testimony that Agent Compton discovered the pieces of paper inadvertently and that the papers were in plain view on the floor of the car in front of the passenger's seat. Taylor's principal contention is that Agent Compton had no reason to believe that the papers were articles of incriminating character. We disagree. Agent Compton saw the words "cinnamaldehyde" and "phenyl acetone" on the pieces of paper. These words denote chemicals that Agent Compton knew were used in the manufacture of methamphetamine. Given that Agent Compton arrested Taylor pursuant to an indictment charging Taylor with conspiracy to manufacture and distribute methamphetamine, pieces of paper containing the words of precursor chemicals certainly were articles of incriminating character. Therefore, Taylor's contention that the Court erred in denying his pretrial motion to suppress these pieces of paper is without merit.

4. *Defendant Taylor's Motions for a Mistrial.*

Defendant Taylor contends that the Court erred in denying his oral motions for a mistrial made during the course of the trial. The only such motion that Taylor specifically refers to is his motion in connection with the testimony of Agent Compton which summarized a post-arrest statement made to him by defendant Curl.

 Agent Compton testified that on January 17, 1979, subsequent to Curl's arrest, Curl told Agent Compton at a DEA office that Curl had been part of an organization which manufactured methamphetamine, that he had ordered chemicals used in the manufacture of methamphetamine, that he had been to two chemical companies, that bogus names had been used at the companies, that he had met with Alfred Moore, and that he had carried drugs. In testifying before the jury concerning Curl's statements to him, Agent Compton never mentioned the name of defendant Taylor and did not in any way implicate defendant Taylor. This was not "a limited redaction" in violation of the *Bruton* rule. *United*

*States v. DiGilio*, 538 F.2d 972, 982–83 (3d Cir. 1976), *cert. denied*, 429 U.S. 1038, 97 S.Ct. 733, 50 L.Ed.2d 749 (1977). Furthermore, immediately following Agent Compton's testimony concerning the statements made by Curl, the Court carefully instructed the jury that Agent Compton's testimony concerning the post-arrest statements made by Curl on January 17, 1979 should be considered only as to defendant Curl and not as to any other defendant. In the charge to the jury, the Court again instructed the jury to consider testimony concerning post-arrest statements as evidence against only the defendant who allegedly made the statement and against no other defendant. Thus, defendant Taylor's contention that the Court erred in denying his motion for a mistrial in connection with the post-arrest statement of defendant Curl is without merit.

5. *Defendant Williams' Motions to Suppress Tapes.*

██ Defendant Williams contends that the Court erred in denying his pretrial motions to suppress evidence of taped conversations between him and Clarence Gardner. Williams contends that Gardner's consent to the taping of the conversations was not voluntary because the government made certain promises to Gardner conditioned upon Gardner's cooperation. Having heard testimony from Gardner, the Court determined that his participation was voluntary. The test is whether the consent to the recording is voluntarily given; consent is not rendered involuntary merely because the person who consents expects some benefit therefrom. *United States v. Moskow*, 588 F.2d 882, 891 (3d Cir. 1978). Therefore, the fact that Gardner was cooperating with the government in the hope of receiving favorable treatment for himself does not render his consent involuntary. Thus, our pretrial ruling was without error.

6. *Defendant Curl's Motion to Suppress His Post-Arrest Statement.*

██ Defendant Curl contends that the Court erred in denying his pretrial motion

to suppress his post-arrest statement on January 17, 1979 on the ground that Curl did not receive adequate *Miranda* warnings and did not waive his constitutional rights prior to making the statement.

The testimony at the pretrial hearing in connection with this motion can be summarized as follows: DEA Agent McGinn testified that he participated in the arrest of defendant Curl at Curl's home at approximately 8:00 a. m. on January 17, 1979. After being awakened and placed under arrest, Curl, in his living room, was advised of his constitutional rights and acknowledged that he understood them. He was taken to the Philadelphia office of the DEA, where Agent Compton asked him if he had been advised of his rights. Curl replied that he had been so advised, that he understood his rights and that he wished to cooperate without his attorney being present. Curl then made the statements which we discussed earlier in connection with defendant Taylor's motion for a mistrial.[9] Both Agent McGinn and Agent Compton testified that Curl was neither threatened, coerced nor struck at any time and that he appeared to be coherent and not under the influence of any alcohol or drugs. The Court finds that the defendant Curl was given his full *Miranda* warnings, that he understood them, and that his statements were given willingly and voluntarily after a valid waiver of his rights. Defendant's contention that we committed error by denying his pretrial motion to suppress is without merit. *See North Carolina v. Butler*, —— U.S. ——, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979); *Biddy v. Diamond*, 516 F.2d 118 (5th Cir. 1975), *cert. denied*, 425 U.S. 950, 96 S.Ct. 1724, 48 L.Ed.2d 194 (1976); *United States v. Stuckey*, 441 F.2d 1104 (3d Cir. 1971); *United States v. Kinsey*, 352 F.Supp. 1176 (E.D.Pa. 1972).

7. *The Motions of the Defendants Alleging Multiple Conspiracies.*

██ All three defendants contend that the Court erred in denying their pretrial

9. *See* Section III(4) *supra.*

motions to dismiss the indictment because multiple conspiracies were charged and because the government presented evidence at trial of more than one conspiracy. Count I of the indictment charged all of the defendants with conspiracy to distribute and manufacture methamphetamine while Count II charged only defendant Williams with using a communication facility to facilitate a conspiracy to manufacture methamphetamine. The evidence adduced at trial by the government concerned the conspiracy charged against all defendants in Count I and a separate conspiracy underlying the charge against Williams alone in Count II that he used a communications facility to facilitate a conspiracy. Defendants have demonstrated no prejudice resulting from the introduction of evidence concerning more than one conspiracy. In fact, the Court finds that neither of the two conspiracies was so complex nor the actors so numerous that the evidence concerning each conspiracy could not be kept separate in the minds of the jurors. As we discussed above in connection with the defendant's motions for judgment of acquittal,[10] the government's case was strong and the evidence was clearly sufficient to establish (as the jury found beyond a reasonable doubt) that all three defendants conspired as charged in Count I and that Williams used the telephone as charged in Count II to facilitate a conspiracy with others who were not defendants.

To ensure that the defendants would not be prejudiced by the introduction of evidence of more than one conspiracy, the Court gave cautionary instructions to the jury not to consider any of the evidence of the conspiracy charged as the underlying felony in Count II in connection with the conspiracy charged in Count I. The jury was also instructed not to draw any inferences from such evidence in connection with the conspiracy charged in Count I. Such cautionary instructions were given not only during the course of the trial at each point when the government introduced evidence of the conspiracy charged as the underlying

conspiracy in Count II, but were also given to the jury in the Court's closing charge. For instance, in its closing charge, the Court told the jury:

You have heard testimony in this case which may be considered as evidence of several conspiracies. In this trial you are being asked to determine whether the evidence shows beyond a reasonable doubt the existence of two conspiracies and two conspiracies only. There is one conspiracy charged in connection with Count I and one conspiracy charged in connection with Count II. Count I charges a conspiracy among all four defendants, Alfred Moore and others to manufacture and distribute methamphetamine, which conspiracy allegedly existed from November, 1976 to September, 1978. Count II charges a conspiracy in connection with the use of the telephone by the defendant, Williams. You are not to consider evidence concerning any other conspiracies. Evidence of any conspiracy other than the conspiracy charged in Count I is not to be considered by you as evidence of the existence of the conspiracy charged in Count I or as evidence that any defendant was a member of the conspiracy charged in Count I, and you must not draw any inferences from such evidence or consider such evidence as making it likely that the conspiracy charged in Count I existed or that any defendant was a member of that conspiracy. Similarly, any evidence of any conspiracy other than the conspiracy charged in Count II in connection with the defendant Williams' alleged use of the telephone is not to be considered by you as evidence of the existence of the conspiracy charged in Count II or as evidence that the defendant Williams was a member of the conspiracy charged in Count II, and you must not draw any inferences from such evidence or consider such evidence as making it likely that the conspiracy charged in Count II existed or that the defendant, Williams, was a member.

* * * * * *

10. *See* Section II *supra.*

There was testimony concerning conversations with Williams in New Orleans, recorded conversations with Williams, and transactions involving the defendant, Williams, and P–2–P in September, 1978, which alleged happenings are set forth in Count I of the indictment as overt acts 29 through 32. The testimony concerning these events in September, 1978 are not to be considered by you as evidence against any defendant other than defendant Williams, nor should any unfavorable inferences be drawn therefrom against any defendant other than Williams. As to defendant Williams, this evidence is to be considered by you only in connection with Count II of the indictment, which alleges the use of the telephone in facilitating a conspiracy to manufacture methamphetamine and no unfavorable inferences should be drawn from this evidence against Williams in connection with the conspiracy charged in Count I of the indictment. The evidence of the events in September, 1978 is not to be considered by you as evidence of the existence of the conspiracy charged in Count I or any defendant's membership in the conspiracy charged in Count I. It is to be considered by you only as to Count II.

Thus, the Court carefully instructed the jury to compartmentalize the evidence in connection with the conspiracy charged in Count I and the conspiracy in connection with the use of the telephone charged in Count II.[11] The Court therefore finds that the defendants have not demonstrated any prejudice from the indictment charging one conspiracy in Count 1 and another conspiracy in connection with Count II or from the introduction of evidence of more than one conspiracy.

■ Furthermore, the defendants have not demonstrated a prejudicial variance between the evidence presented at trial and the offenses alleged in the indictment. The indictment sufficiently informed each defendant of the charges against him so that he could prepare his defense and not be misled or surprised at trial. Although the jury heard evidence as to the conspiracy charged against all three defendants in Count I and evidence of a separate conspiracy in connection with Count II, the Court's instructions to the jury were such that the jury was able to compartmentalize the evidence without prejudice to any defendant. *See United States v. Boyd*, 595 F.2d 120 (3d Cir. 1978); *United States v. Schoenhut*, 576 F.2d 1010, 1021–22 (3d Cir.), *cert. denied*, 439 U.S. 964, 99 S.Ct. 450, 58 L.Ed.2d 421 (1978); *United States v. Baldarrama*, 566 F.2d 560, 565 (5th Cir.), *cert. denied*, 437 U.S. 906, 98 S.Ct. 3094, 57 L.Ed.2d 1136 (1978); *United States v. Somers*, 496 F.2d 723, 746 (3d Cir.), *cert. denied*, 419 U.S. 832, 95 S.Ct. 56, 42 L.Ed.2d 58 (1974).

*Kotteakos v. United States*, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946), is not applicable to the facts of this case. Under *Kotteakos*, proof at trial which establishes the existence only of multiple conspiracies when a single conspiracy is charged in the indictment creates a prejudicial variance. In the present case, a single conspiracy was charged in Count I and one of the defendants, Williams, was charged in Count II with using the telephone in connection with a conspiracy on September 22, 1978, when $5400 was delivered for six bottles of P–2–P and an agreement was reached concerning the manufacture and delivery of methamphetamine. As heretofore discussed, there was no variance nor were the substantial rights of any defendant affected by any alleged variance. *See United States v. Boyd, supra.*

Therefore, the defendants' contention that the Court erred in denying their pretrial motions to dismiss the indictment be-

---

11. In addition, the jury was told:

A separate crime or offense is charged in each count of the indictment. Each offense and the evidence applicable thereto should be considered separately by you. The fact that you may find one or more of the defendants guilty or not guilty of one of the offenses charged should not control your verdict with respect to any other offense or any other defendant. It is, therefore, necessary for you to make a separate finding of guilty or not guilty with respect to each defendant as to each count in which that defendant is charged.

cause multiple conspiracies were charged and because the government presented evidence at trial of more than one conspiracy is without merit.

8. *Defendant Williams' Motion Based on Newly Discovered Evidence.*

Defendant Williams contends that the Court should grant him a new trial because of newly discovered evidence. Specifically, he claims that subsequent to trial he learned that "Drug Enforcement Administration Chemist William Phillips of New York City has and will testify that the Government, either negligently or intentionally, concealed from this Court that Phenol-two-Propanol is widely used in various circumstances, many of which do not involve the production of a controlled substance." The government chemist who testified at this trial stated that he was aware of no other uses for P–2–P except the manufacture of methamphetamine and certain pharmaceuticals.

To prevail on a motion for a new trial on the ground of newly discovered evidence, a defendant bears the heavy burden of establishing five requirements:

(a) the evidence must be in fact, newly discovered, i. e., discovered since the trial; (b) facts must be alleged from which the court may infer diligence on the part of the movant; (c) the evidence relied on must not be merely cumulative or impeaching; (d) it must be material to the issues involved; and (e) it must be such, and of such nature, as that, on a new trial, the newly discovered evidence would probably produce an acquittal.

*United States v. Howell*, 240 F.2d 149, 159 (3d Cir. 1956); *see United States v. Rocco*, 587 F.2d 144, 146 (3d Cir. 1978); *United States v. Iannelli*, 528 F.2d 1290, 1292 (3d Cir. 1976).

For the purpose of this discussion we shall make the assumption that the first and second requirements enumerated above have been satisfied. We are convinced, however, that the remaining three requirements have not been satisfied.

As to the third requirement, we find that this "newly discovered evidence merely impeaches the credibility of the DEA chemist in this case who testified that P–2–P has no uses other than the manufacture of methamphetamine and certain pharmaceuticals. Newly discovered impeachment evidence is not sufficient to justify a new trial. *See Casey v. United States*, 522 F.2d 206, 207 (5th Cir. 1975), *cert. denied*, 426 U.S. 909, 96 S.Ct. 2233, 48 L.Ed.2d 835 (1976); *United States v. Byrne*, 451 F.Supp. 109, 111–12 (E.D.Pa.1978).

The fourth requirement is that the "newly discovered evidence" must be material to the issues involved. Testimony that P–2–P can be used in the manufacture of perfume or for rodent extermination as claimed by the defendant is not material to the issue that defendant Williams conspired to manufacture and distribute methamphetamine or used a telephone to facilitate a conspiracy to manufacture methamphetamine.

The final requirement for granting a new trial based on "newly discovered evidence" is that the evidence must be of such a nature that at a new trial it would probably produce an acquittal. There was an abundance of evidence that defendant Williams was using P–2–P for the manufacture of methamphetamine. This evidence included an admission by Williams on more than one occasion that he was delivering P–2–P to others for the manufacture of methamphetamine. It is not probable, therefore, that testimony that P–2–P can be used for manufacturing perfume and for rodent extermination would produce an acquittal in a new trial. Thus, defendant Williams' contention that a new trial should be granted based on newly discovered evidence is without merit.

9. *Other Allegations of Error.*

While we do not herein discuss all the contentions of alleged error raised by the defendants, we have considered each and every allegation of error and hold that none of them, singly or collectively, is of sufficient substance to merit any further discus-

sion as a basis for granting a new trial in this case.

Accordingly, an Order will be entered denying the defendants' motions for arrest of judgment, judgment of acquittal and a new trial.